UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALTAVION, INC., a California corporation,<br><br>             Plaintiff,<br><br>    v.<br><br>KONICA-MINOLTA SYSTEMS LABORATORY, INC., a corporation; PAUL CATTRONE, an individual; and DOES 1 through 50 inclusive,<br><br>             Defendants. | No. C 07-06358 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Motion to Remand** |

    Plaintiff Altavion, Inc. ("Altavion") filed this action in state court, alleging, *inter alia*, that defendants Konica-Minolta Systems Laboratory, Inc. ("Konica") and Paul Cattrone ("Cattrone") (collectively "defendants") misappropriated Altavion's trade secrets in violation of state law and agreements between the parties. Altavion also alleges that defendants caused to be filed with the United States Patent and Trademark Office ("USPTO") ten patent applications disclosing plaintiff's trade secrets related to confidential and proprietary digital stamping technology. Defendants filed a notice of removal, asserting that substantial questions of patent law exist. Now before the court is plaintiff's motion to remand. Having considered the parties' arguments and submissions,[1] and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

Plaintiff Altavion was founded by Dr. Ali Moussa in March 2000. Notice of Removal, Exh. A, Complaint ¶ 7 (hereinafter "Complaint"). It is a California corporation with headquarters in Santa Clara County, California. Id. ¶ 1. Altavion develops proprietary digital document security solutions referred to as "digital stamping technology." Id. ¶ 7. According to Altavion, digital stamping technology provides a mechanism for verifying whether a document is authentic and for identifying whether the document's integrity has been breached through alterations or tampering. Id. ¶ 8. Defendant Konica is a California corporation domiciled in San Mateo County, California. Id. ¶ 3. Konica develops office machines such as printers, scanners, and copiers. Pl.'s Mtn. at 2. Defendant Cattrone is an independent consultant for Konica. Complaint ¶ 16.

Plaintiff alleges that on numerous occasions beginning in the Fall of 2002, Altavion met with Konica to discuss and negotiate terms by which Konica would purchase Altavion's digital stamping to incorporate it into Konica's scanner products. Id. ¶¶ 10, 13. To protect both parties' confidential and proprietary information, the parties signed a Confidential and Mutual Non-Disclosure Agreement ("NDA"). Id. ¶¶ 11, 12. Subsequently in 2004, the parties signed a Memorandum of Understanding ("MOU") in which they recognized that the digital stamping technology was Altavion's intellectual property entitled to protection under the NDA and agreed to negotiate a license and/or revenue sharing agreement in the event that Konica developed, marketed, and sold a product utilizing Altavion's digital stamping technology. Id. ¶ 20.

Altavion alleges that six months after signing the NDA and approximately two months before signing the MOU, Konica filed the first in a series of ten United States patent applications which disclose Altavion's proprietary digital stamping technology.[2] Id. ¶ 23. Altavion alleges that Konica filed the patent applications without notifying Altavion or obtaining its consent and further alleges that the applications do not disclose or cite Altavion's digital stamping technology as prior art references. Id. ¶¶ 23, 24. As the parties stated at the hearing on this motion, it is undisputed that the patent applications are still pending before the USPTO and consequently, no patents have issued from the applications. In or about October 2004, less than two months after signing the MOU, Altavion alleges that Konica abruptly and without notice terminated all communications or contact

2

1  with Altavion. Id. ¶ 22. Altavion asserts that it only learned of Konica's patent applications after its
2  founder Dr. Ali Moussa discovered them while surfing the Internet in or about October 2006.
3  Id. ¶ 24.

4  On November 9, 2007 plaintiff Altavion filed the instant action in San Mateo County Superior Court alleging state law claims for misappropriation of trade secrets, conversion, breach of contract, unjust enrichment, unfair business practices, and fraud. On December 14, 2007 defendants filed a notice of removal under 28 U.S.C. section 1441, asserting that this court has original jurisdiction under 28 U.S.C. section 1338(a) because this case turns on a substantial question of federal patent law. Because the parties are both citizens of California for the purposes of diversity jurisdiction, federal jurisdiction, if it exists, cannot be premised on 28 U.S.C. section 1332. On January 9, 2008 plaintiff filed the instant motion requesting that this action be remanded to state court and also requesting payment of attorneys' fees and costs under 28 U.S.C. section 1447(c).

LEGAL STANDARD

Removal under 28 U.S.C. section 1441(b) is permitted for actions over which a federal district court could have exercised original jurisdiction. The removing party bears the burden of establishing that removal is proper. Emrich v. Touche Ross & Co., 846 F.2d 1190, 1195 (9th Cir. 1990). The removal statutes are strictly construed such that any doubts are resolved in favor of remand. Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992).

Federal courts have original and exclusive jurisdiction in "any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). The Supreme Court in Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 809 (1988), held that section 1338(a) confers jurisdiction on federal courts in those cases in which "a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." The Supreme Court's use of the phrase "either . . . or" makes clear that the Christianson test consists of two independent prongs, either of which is sufficient to confer federal jurisdiction.

3

1   "Under the well-pleaded complaint rule, . . . whether a claim arises under patent law must be
2   determined from what necessarily appears in the plaintiff's statement of his own claim . . . , unaided
3   by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may
4   interpose." Id. (internal quotations omitted).  Moreover, "[i]f on the face of a well-pleaded
5   complaint there are reasons completely unrelated to the provisions and purposes of the patent laws
6   why the plaintiff may or may not be entitled to the relief it seeks, then the claim does not arise under
7   those laws.  Thus, a claim supported by alternative theories in the complaint may not form the basis
8   for section 1338(a) jurisdiction unless patent law is essential to each of those theories." Id. at 810
9   (internal quotations omitted).

DISCUSSION

I.   Motion to Remand

In this case, there is no dispute that plaintiff's causes of action for misappropriation of trade secrets, conversion, breach of contract, unjust enrichment, unfair business practices, and fraud are created by state statutes and common law, not by federal patent law.  Accordingly, if there is federal jurisdiction over this action, it cannot be premised on the first prong of the Christianson test requiring the cause of action to be created by federal patent law.  Instead, the parties' dispute lies with the second prong of the Christianson test.  Defendants argue that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims, while plaintiff argues to the contrary.  As explained more fully below, this court agrees with plaintiff that the claims do not arise under federal patent law as defined by the second prong of the Christianson test.

The Supreme Court in Christianson made clear that the well-pleaded complaint rule focuses on claims, not theories.  In other words, "just because an element that is essential to a particular *theory* might be governed by federal patent law does not mean that the entire . . . *claim* 'arises under' patent law." Christianson, 486 U.S. at 811 (emphases added).  In Christianson, the plaintiff was a former employee of defendant—the leading manufacturer, seller, and marketer of M16 rifles. Id. at 804.  After leaving the employ of defendant, plaintiff used information defendant considered

4

1  proprietary to establish a competing business selling M16 rifles. Id.  When defendant's patent
2  infringement suit against plaintiff was unsuccessful, defendant notified plaintiff's current and
3  potential customers that plaintiff was illegally misappropriating defendant's trade secrets and urged
4  them to refrain from doing business with plaintiff. Id. at 804–5.

5        Plaintiff then brought suit against the defendant alleging that defendant's conduct drove
6  plaintiff out of business. Id. at 805. Plaintiff asserted, in federal district court, a cause of action
7  under federal antitrust law and a second cause of action under state law for tortious interference with
8  business relations. Id.  The district court granted summary judgment in favor of plaintiff on both
9  causes of action and defendant appealed to the Federal Circuit. Id. at 806. The Federal Circuit
10 concluded that it lacked jurisdiction over the appeal and transferred the case to the Seventh Circuit,
11 at which point the Seventh Circuit also found that it lacked jurisdiction and transferred the case back
12 to the Federal Circuit. Id. at 806–7.

13       The Supreme Court granted certiorari to resolve this "peculiar jurisdictional battle" between
14 the Federal Circuit and the Seventh Circuit, both of which "adamantly disavowed jurisdiction over
15 [the] case" and "insist[ed] that the other's jurisdictional decision [was] 'clearly wrong.'" Id. at 803.
16 The Supreme Court first observed that "patent law did not in any sense create [plaintiff's] antitrust
17 or intentional-interference claims," and therefore, the dispute centered around whether patent law
18 "[was] a necessary element of one of the well-pleaded [antitrust] claims." Id. at 809.

19       The Court noted that one theory supporting plaintiff's antitrust claims was that defendant's
20 patents were invalid from inception for failure to disclose sufficient information to satisfy the
21 enablement requirement of 35 U.S.C. section 112. Id. at 811–13, 806. According to this theory,
22 because defendant achieved its dominant position in the marketplace through protection afforded by
23 invalid patents, the "trade secrets" that the patents should have disclosed lost any state-law
24 protection. Id. Defendant's accusations of plaintiff's trade-secret infringement were therefore false
25 if defendant had no trade secrets to protect.[3] Id. The Supreme Court noted that the Seventh Circuit
26 and defendant perceived this theory—in which a substantial question of patent law regarding
27 invalidity for lack of enablement was a necessary element—to be the *only* theory upon which
28 plaintiff's claims were based. Id. at 811. But, the Court argued, this was not so. Apart from the

5

theory that defendant had no trade secrets to protect because its patents were invalid, another theory "equally prominent in the complaint" was that defendant had given plaintiff permission to use the supposedly secret and proprietary information. Id. at 811, 813.  Even if a patent law issue was an essential element of the former *theory* of monopolization, the antitrust *claim* could have been supported by alternative theories such as the latter having nothing to do with the validity of defendant's patents. Id. at 813.  Consequently, "the appearance on the complaint's face of an alternative, non-patent theory [compelled] the conclusion that the [antitrust] claim [did] not 'arise under' patent law." Id.

Similarly, in this case, even if it can be argued that a patent law issue is a necessary element of a particular theory supporting plaintiff's claims, as long as there appears on the face of the complaint some alternative, non-patent law theory sufficient to support the claims, the claims do not "arise under" federal patent law.  For example, defendant focuses particular attention on paragraph 62 of the complaint in which plaintiff alleges the following facts in its connection with its sixth claim for fraud:

> defendant KONICA-MINOLTA misrepresented to the [USPTO] the true inventors corresponding to the [ten listed Patent Applications].  Specifically in this regard, as each of the pending Patent Applications contain ALTAVION'S proprietary DST [i.e. "Digital Stamping Technology"] intellectual property, Dr. Moussa is a significant and true inventor of the disclosed technology and should be named as an inventor on each Application.  ALTAVION is informed and believes and based thereon alleges that the omission of Dr. Moussa as an inventor on each of the identified Patent Applications has caused financial damage to ALTAVION.

Although not specifically framed in their brief, defendants' focus on this paragraph suggests that defendants are arguing that one theory supporting plaintiff's claim for fraud is that defendants falsely represented to the USPTO the identity of the inventor of the digital stamping technology. Under this theory of fraud, the argument continues, a necessary element is a determination of inventorship, which the Federal Circuit has recognized is a substantial question of federal patent law. See Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1330 (Fed. Cir. 1998) (identifying at least four issues of federal patent law substantial enough to confer jurisdiction—infringement, inventorship, attorneys' fees, and the revival of an allegedly unintentionally abandoned patent application) (overruled on other grounds).

6

But like the Supreme Court found in Christianson, this court finds in this action that quite apart from any theory in which inventorship may be a necessary element, there appears on the face of the complaint an alternative theory which has nothing to do with inventorship of the technology disclosed in the patent applications, or any other question of federal patent law, substantial or insubstantial. In paragraph 61, immediately preceding the paragraph to which defendants draw particular attention, plaintiff alleges the following facts, also in connection with its sixth claim for fraud:

> defendants falsely represented their intentions with respect to obtaining and using the scientific and technical information ALTAVION provided regarding DST systems and solutions commencing in or about the Fall of 2002. Specifically in this regard, from the inception and throughout the course of numerous meetings and communications between defendant KONICA-MINOLTA, Dr. Moussa and ALTAVION, KONICA- MINOLTA expressly stated its substantial interest in incorporating DST solutions and systems into KONICA-MINOLTA products and working in conjunction with ALTAVION in order to achieve this objective. . . . Based in large part on this premise—the prospect of licensing future DST applications within KONICA-MINOLTA products—ALTAVION executed a NDA [i.e. "Non-Disclosure Agreement"] with KONICA-MINOLTA and divulged, in profuse detail, its proprietary and confidential DST intellectual property believing that the information would remain confidential pursuant to the NDA. . . . ALTAVION is informed and believes and based thereon alleges that defendant intended to misappropriate ALTAVION'S DST intellectual property instead of evaluate it for license purchase.

In other words, this alternative theory of fraud alleges that, apart from any misrepresentation made to the USPTO regarding the true inventor of the technology disclosed in the patent applications, defendants represented to plaintiff that they intended to consider and evaluate whether plaintiff's DST solutions could be licensed and incorporated into defendants' products, when in fact, defendants had no real intention to do so. In reliance upon this false representation, plaintiff divulged its proprietary, confidential, and secret information to defendant, suffering damage as a result. Moreover, as plaintiff alleges elsewhere in the complaint, see Complaint ¶¶ 20, 45, 64, defendant also represented to plaintiff in the parties' MOU that defendants recognized plaintiff's "unique implementation of digital stamping technology as Altavion's own intellectual property and [would] continue to protect Altavion's technology as defined under the [parties'] NDA." Plaintiff alleges that these representations were false because defendants did not in fact recognize the technology as plaintiff's intellectual property, had no real intention to protect its confidential nature,

and desired to use the information for its own benefit at plaintiff's expense. This theory-of-the-case—which also underlies plaintiff's other claims for misappropriation of trade secrets, conversion, breach of contract, unjust enrichment, and unfair business practices—does not require a determination of patent inventorship. Consequently, the court concludes that each of plaintiff's claims is supportable by a theory that does not require as a necessary element resolution of a substantial question of federal patent law. Plaintiff's claims do not "arise under" patent law as required for federal jurisdiction under 35 U.S.C. section 1338(a).

Defendants' allegedly fraudulent conduct before the USPTO will no doubt be a large part of the proceedings in this action. But the significance of defendants' conduct before the USPTO is not that it forms the exclusive *theory* upon which plaintiff's claims are based, but rather, that it provides probative *evidence* supporting plaintiff's claims that defendant has unlawfully disclosed and used plaintiff's trade secrets, has breached the parties' contract, and has made false representations to the plaintiff. The mere fact that defendants have filed ten patent applications disclosing various elements of plaintiff's digital stamping technology does not convert this action into one "arising under" the federal patent laws. Had defendants' disclosure of the technology occurred in a different factual context, such as in discussions with a third-party competitor, in an annual filing before the Securities and Exchange Commission, or in an advertisement to the public, plaintiff would still have a viable theory on which to base its claims. Accord Uroplasty, Inc. v. Advanced Uroscience, Inc., 239 F.3d 1277, 1280 (Fed. Cir. 2001) (former CEO's use and disclosure of company's trade secrets and confidential information in a patent may be *evidence* in support of company's claims for misappropriation of trade secrets, breach of fiduciary duty, and breach of contract, but the mere existence of the patent does not create a necessary and substantial issue of patent law sufficient to confer federal jurisdiction under section 1338(a)).

Moreover, in order to succeed on its claims under the theory that defendants misrepresented to plaintiff their intentions to license and protect as confidential plaintiff's digital stamping technology, plaintiff may have to show in its prima facie case that the technology in fact "belonged" to or was "owned" by plaintiff. This may require a determination of who "created" or "conceived of" the technology. But "conception of inventions" is not "solely a technical question of patent

8

law," American Tel. & Tel. Co. v. Integrated Network Corp., 972 F.2d 1321,1324 (Fed. Cir. 1992), and the fact that a state trade secret and breach of contract action "may involve a determination of the true inventor does not convert that action into one 'arising under' the patent laws," Consolidated World Housewares, Inc. v. Finkle, 831 F.2d 261, 265 (Fed. Cir. 1987). See also Board of Regents v. Nippon Tel. & Tel. Corp., 414 F.3d 1358 (Fed. Cir. 2005). While the inquiry of who conceived an invention, whether it arises in the context of state trade secret or federal patent law, may involve examination of similar or identical evidence, the inquiry in the two contexts is legally distinct because state trade secret law and federal patent law give rise to different bundles of enforceable rights. In other words, the phrase "conception of an invention" is a term of art carrying different legal connotations and implications depending upon the context in which it arises.

Confining the issue of conception of an invention to the exclusive domain of federal patent law would transform many traditionally state law cases such as this one into a case "arising under" the patent laws. It would also narrow the role that state courts play in protecting legitimately held intellectual property rights created under state trade secret law. In considering the interaction of parallel systems for the protection of intellectual property—one established by Congress under federal patent law and the other established by a State under trade secret law—the Supreme Court has held that federal patent law does not necessarily preempt state trade secret law even where state law extends protection to clearly patentable subject matter. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974). Exercising federal jurisdiction over this case because it may involve a question of "conception of an invention" would disrupt this parallel state-federal system of intellectual property rights, something both the Federal Circuit and the Supreme Court have cautioned against. See Integrated Network, 972 F.2d at 1324 (the meaning of "conception" for purposes of interpreting a contract assigning employees' inventions to employer "may be more a question of common sense than patent law" and courts will not "assume a bob-tailed meaning that could lead to derogation of the primary right of the state courts to decide what state law has to say about [the] contract"); Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314, 319 (2005) (warning against the exercise of federal jurisdiction where it might "herald[] a potentially enormous shift of

9

1  traditionally state cases into federal courts" and where it could "disturb[] any congressionally
2  approved balance of federal and state judicial responsibilities").

3        Finally, defendants urge the court to look not just to the *claims* plaintiff asserts, but also to
4  the *relief* plaintiff seeks. Defendants' brief, in fact, is couched almost entirely in terms of the relief
5  sought rather than the claims asserted. Aside from monetary relief for lost licensing and revenue
6  sharing income, plaintiff also seeks injunctive relief: (1) "[r]estraining defendant KONICA-
7  MINOLTA from seeking to exploit any rights, either directly or through third parties, with respect to
8  the [ten Patent Applications filed by defendant]"; and (2) "[o]rdering defendant KONICA-
9  MINOLTA to recognize ALTAVION'S ownership of all patent applications, including the [ten filed
10 by defendant], comprising ALTAVIONS'S DST intellectual property." Complaint, Prayer for
11 Relief, ¶¶ 1(A), 1(C). Defendants argue that this injunctive relief necessarily depends on a
12 resolution of "inventorship." Therefore, federal court jurisdiction is proper. For the reasons stated
13 below, the court does not find defendants' argument persuasive.

14       First, as the court has already discussed, each of plaintiff's claims may be adjudicated and
15 appropriate monetary and injunctive relief may be awarded without resolution of "inventorship" in
16 the technical sense used in patent law. Rather, the claims and resulting relief that may be awarded
17 may turn on "inventorship" of intellectual property as used in the more generic sense of state trade
18 secret law.

19       Second, even if paragraphs 1(A) and 1(C) of the prayer for relief can be interpreted as
20 implicitly asserting a cause of action for a declaration and correction of "inventorship" as used in
21 patent law, the court's conclusion above that this case does not arise under patent law remains
22 unchanged. Defendants cite two district court cases for the proposition that inventorship disputes on
23 patent applications give rise to federal jurisdiction. Heineken Technical Servs. v. Darby, 103 F.
24 Supp. 2d 476, 479 (D. Mass. 2000); Kosower v. Gutowitz, 2001 WL 1488440 (S.D.N.Y. 2001). In
25 both of these cases, plaintiffs asserted a causes of action under 35 U.S.C. section 116 seeking a
26 declaration that it was the inventor of technology disclosed in patent applications filed by the
27 defendant. In both cases, the court denied defendant's motion to dismiss the section 116 claim for
28 lack of federal jurisdiction.

10

The validity of the holdings in Heineken and Kosower are questionable, however, in light of more recent cases finding that there is no private cause of action under section 116, and hence no federal court authority to determine inventorship disputes prior to the issuance of a patent. Rather, authority to declare and correct inventors in *patent applications,* as opposed to *issued patents*, belongs exclusively to the USPTO. See Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1356 n.1 (Fed. Cir. 2004); E.I. Du Pont de Nemours & Co. v. Okuley, 344 F.3d 578 (6th Cir. 2003); Airport Surface Technologies L.L.C. v. Fieldturf, Inc., 268 F. Supp. 2d 999 (N.D. Ill. 2003); Sagoma Plastics, Inc. v. Gelardi, 366 F. Supp. 2d 185 (D. Me. 2005); Czarnik v. Illumina, Inc., 437 F. Supp. 2d 252 (D. Del. 2006); Carter v. ALK Holdings, Inc., 510 F. Supp. 2d 1299 (N.D. Ga. 2007); Gens v. Sez America, 2007 WL 832050 (N.D. Cal. 2007); Branimir Simic-Glavaski v. Lifeware Technologies, Inc., 2008 WL 423414 (N.D. Ohio 2008). This court also declines to follow Heineken and Kosower. In sum, even if plaintiff's request for relief can be characterized as implicitly stating a cause of action for a declaration and correction of inventorship in the patent applications, a federal court would have no authority to adjudicate this dispute and consequently, no basis for exercising federal jurisdiction.

Defendants have failed to carry their burden of establishing that removal is proper, and any doubts which remain should be resolved in favor of remand. Accordingly, plaintiff's motion to remand is GRANTED.

II.     Motion for Costs and Attorneys' Fees

The final matter which the court must address is plaintiff's request for costs and attorneys' fees associated with bringing this motion to remand. Upon granting a motion to remand, a district court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The standard for awarding attorneys' fees under 28 U.S.C. section 1447(c) turns on the reasonableness of the removal. Martin v. Franklin Capitol Corp., 546 U.S. 132, 141 (2005). "Absent unusual circumstances, courts may award attorneys' fees under section 1447(c) only where the removing party lacked an objectively reasonable basis for

seeking removal.  Conversely, where an objectively reasonable basis exists, fees should be denied.  In applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case."  Id.  Such "unusual circumstances" may include "plaintiff's delay in seeking remand or failure to disclose facts necessary to determine jurisdiction."  Id.; see also Gardner v. UICI, 508 F.3d 559, 561–62 (9th Cir. 2007).

The line between cases that do and do not "arise under" the patent laws for purposes of 35 U.S.C. section 1338(a) is "very subtle," and the question leads down what has been called "one of the darkest corridors of the law of federal courts and federal jurisdiction."  Wright, Miller, and Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3582 at 307 n.1 (citing Chisum, The Allocation of Jurisdiction between State and Federal Courts in Patent Litigation, 46 Wash. L. Rev. 633 (1971)).  Given the complex and subtle questions of law which were raised by this motion, and given that defendants' basis for removal relied on Heineken and Kosower—which have been questioned by other courts, but have not been expressly overruled—defendants had an objectively reasonable basis for removing this action.  Moreover, the court does not find any unusual or extenuating circumstances that would warrant a departure from the general rule asking whether defendants' removal was objectively reasonable.  Accordingly, plaintiff's request for an award of costs and attorneys' fees is DENIED.

CONCLUSION[4]

For the reasons stated above, the court GRANTS plaintiff's motion to remand and DENIES plaintiff's motion for costs and attorneys' fees.  The Clerk of Court shall transmit forthwith a certified copy of this order to the Clerk of the Superior Court of the County of San Mateo, California.

IT IS SO ORDERED.

Dated: May 7, 2008

MARILYN HALL PATEL
United States District Judge
Northern District of California

12

## ENDNOTES

1.   Defendants also filed a motion for leave to file a sur-reply in opposition to plaintiff's motion to remand, arguing that this court should grant leave because plaintiff's reply brief posed new arguments and relied upon cases which had not been previously cited. Because defendant has shown good cause, defendants' motion is GRANTED. In ruling on plaintiff's motion to remand, the court has considered defendants' sur-reply.

2.   The ten patent applications are: US 2005–0284944; US 2006–0027660; US 2006–0213993; US 2006–0213965; US 2007–0177824; US 2007–0176001; US 2007–0176000l; US 2007–0199994; US 2007–0201106; US 2007–0204164.

3.   The Court assumed, without deciding, that this line of argument was an essential element of plaintiff's prima facie case, rather than an argument in anticipation of a defense. Id. at 811.

4.   Plaintiff has contacted the court anxious about the issuing of an order of remand, suggesting that the order is merely ministerial and that the court could merely sign the submitted proposed order and the parties could be on their way. The proposed order is typical boiler plate.
   An order of remand, as with any order on a serious motion, is not ministerial or formulaic. The parties are entitled to know the reasons for the court's order, and the order should be well-reasoned. As the parties will note from this order, further research and development of the analysis were necessary. Had the parties been more expiscatory in their research and analysis it might have saved more of the court's time.